UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-21517-CIV-HUCK/OTAZO-REYES

JOHN DOE,

      Plaintiff,

v.

EJERCITO DE LIBERACION NACIONAL,
a/k/a ELN, a/k/a National Liberation Army,
and FUERZAS ARMADAS
REVOLUCIONARIOS DE COLOMBIA,
a/k/a FARC, a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA,

      Defendants,

v. SSM Petcoke LLC,

      Garnishee.

_____/

## SEALED MOTION FOR RELEASE OF FUNDS HELD BY GARNISHEE, SSM PETCOKE LLC

Plaintiff, John Doe, pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note (the "TRIA") and Fed. R. Civ. P. 69, hereby moves for an order compelling SSM Petcoke LLC ("Garnishee" or "SSM Petcoke") to turn over certain funds that are now in its possession. The funds to be executed upon are the subject of a Writ of Execution issued May 8, 2013 and a Judgment Lien Certificate filed with the Florida Secretary of State on October 25, 2017.  The writ and lien enforce the Default Final Judgment entered by this Court on January 5, 2012.  DE 42.

Garnishee SSM Petcoke, according to its Answer and Affirmative Defenses, requests only compliance with the TRIA and garnishment statutes, and that any indispensable party be named, as well as the statutory garnishment fee and payment of its

attorneys' fees and costs as a liquidated sum.  Plaintiff agrees to accept the subject funds held by SSM Petcoke after offsets for such fees.

## INTRODUCTION

To execute on a judgment under the TRIA, Plaintiff must meet five prerequisites: (1) the judgment is against a terrorist party; (2) the claim is based upon an act of terrorism; (3) the assets at issue were blocked under one of the specific authorities enumerated in the TRIA; (4) the claim is for compensatory damages; and (5) the assets belong to an agency or instrumentality of a terrorist organization judgment debtor. Numbers 1, 2 and 4 have already been found by this Court during prior turnover motions and are law of the case.  Number 3 is undeniable, as the blocking authority is explicitly under one of the enumerated authorities, specifically the International Emergency Economic Powers Act (the "IEEPA").  This motion presents overwhelming evidence of number 5.  The assets held by SSM Petcoke belong to Petrocedeño SA, a/k/a PDVSA Petrocedeno SA[1], (Petrocedeño).  Petrocedeño is a subsidiary of Venezuela's state-owned oil company, PDVSA, and is majority-owned and controlled by PDVSA.  The Executive Branch, by way of  Executive Order 13857, found that, "the term 'Government of Venezuela' includes the state and Government of Venezuela, any political subdivision, agency or instrumentality thereof, **including … Petroleos de Venezuela, S.A. (PDVSA), [and] any person owned or controlled, directly or indirectly, by the foregoing …"** (emphasis provided).  Venezuela is by all reports, and its own recent admissions, an aider and abettor of both FARC and the ELN.  That alone establishes the necessary agency and

---

[1] The company employs both names.  Its logo states "PDVSA Petrocedeño".  *See* LinkedIn page, attached hereto as Exhibit A and *available at https://www.linkedin.com/company/pdvsa-petrocede-o-s.a./about/*

instrumentality.  But, in fact, Petrocedeño is an active cog in that aiding and abetting by, along with other PDVSA subsidiaries, not only laundering drug money for the FARC and ELN, but also providing material and logistics to them as well.

## BACKGROUND

1.     In September 1997, Plaintiff, a Venezuelan citizen and resident at the time, had just returned to Venezuela from a business trip to Colombia when he was kidnapped by the Ejército Nacional de Liberacion ("ELN"), trafficked to Colombia, sold to the Fuerzas Armadas Revolucionarios de Colombia ("FARC"), tortured in unspeakable ways, and ransomed.

2.     In 2010, Plaintiff brought suit against these two transnational narco-terrorist organizations under the Alien Tort Statute, 28 U.S.C. § 1350, and Civil RICO, 18 U.S.C. §§ 1961-1698.  On January 5, 2012, this Court awarded Plaintiff a judgment for $36,800,000.00.  DE 42 (the "Judgment").  The Judgment consisted of $16,800,000.00 in compensatory damages, jointly and severally, and $10,000,000.00 in punitive damages against each Defendant.

3.     In the ensuing years, Plaintiff collected the sum of $545,935.93.  Thus, the bulk of the Judgment plus interest still remains due and owing.  Specifically, $16,407,177.41 of the compensatory portion of the judgment, plus interest since August 28, 2019, remains due and owing.  *See* Affidavit of John Thornton, attached hereto as Exhibit B.  Plaintiff does not believe that the Defendants have in their possession visible property on which levy can be made sufficiently to satisfy said Judgment.  *Id.*

4.      Having learned through discovery that SSM Petcoke held assets of Petrocedeño SA, a/k/a PDVSA Petrocedeno SA[2], (Petrocedeño) that had been blocked pursuant to a designation made by the Department of Treasury's Office of Foreign Assets Control ("OFAC"), Plaintiff served SSM Petcoke with a Writ of Garnishment on August 9, 2019.  DE 256, Return of Service.

5.      SSM Petcoke indicated in its Answer and Affirmative Defenses filed in response to the Writ of Garnishment, that at the time of the service of the Writ of Garnishment, it had in its possession blocked funds of Petrocedeño in the amount of $18,837,114.83.  DE 252.  Petrocedeño is a subsidiary of Venezuela's state-owned oil company, PDVSA, and is majority-owned and controlled by PDVSA.[3]

6.      As will be shown herein, the Maduro regime of Venezuela (like the Chavez regime that preceded it), along with its subdivisions and state-owned entities, works hand in glove with the narco-terrorist organizations that kidnapped, tortured and ransomed the Plaintiff/Judgment creditor.  The Government of Venezuela, its subdivisions and agencies, including the Venezuelan military and state-owned companies, cooperate with both of the judgment debtors in this matter, such that they are agencies and instrumentalities of the judgment debtors.[4]  As such, under section 201(a) of

---

[2] The company employs both names.  It's logo contains both.  *See* LinkedIn page, attached hereto as Exhibit A and *available at https://www.linkedin.com/company/pdvsa-petrocede-o-s.a./about/*
[3] Petrocedeño is majority-owned by PDVSA.  CITE.
[4] According to Executive Order 13857, which was issued on January 25, 2019, "the term 'Government of Venezuela' includes the state and Government of Venezuela, any political subdivision, agency or instrumentality thereof, including … Petroleos de Venezuela, S.A. (PDVSA), [and] any person owned or controlled, directly or indirectly, by the foregoing …".  Further, 31 C.F.R § 591.406 provides that "persons whose property and interests in property are blocked pursuant to § 591.201 [the Venezuela sanctions] have an interest in all property and interests in property of an entity in which

the TRIA, the blocked assets of entities of the Maduro regime, including the blocked

assets here, are available to satisfy the judgment this Court awarded Plaintiff as

compensation for the crimes he suffered at the hands of their terrorist organization allies.

## LEGAL ANALYSIS

All notice requirements under Florida garnishment statutes have been satisfied,

and the TRIA requirements have been satisfied.

### A. Compliance with the Court's Order and Florida's Garnishment Statutes

As this Court has held, pursuant to Federal Rule of Civil Procedure 69, the Court

must follow state law with regard to garnishment procedures.  DE 178 at 9; *see also*

*Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 730, 748 (11th Cir.

2014) (holding that "judgment creditors seeking to satisfy judgments under it [the TRIA]

must follow the notice requirements of Florida law" and that "Plaintiffs should have

provided formal notice of the garnishment and execution proceedings to the owners of

the property, as Florida law provides").

The Florida garnishment procedures with which Plaintiff must comply are

outlined in sections 77.041(2) and 77.055, Florida Statutes.  *Id.*

Section 77.041(2) provides as follows:

> The plaintiff must mail, by first class, a copy of the writ of garnishment, a
> copy of the motion for writ of garnishment, and, if the defendant is an
> individual, the "Notice to Defendant" to the defendant's last known
> address within 5 business days after the writ is issued or 3 business days
> after the writ is served on the garnishee, whichever is later. However, if
> such documents are returned as undeliverable by the post office, or if the

---

such blocked persons own, whether individually or in the aggregate, directly or
indirectly, a 50 percent or greater interest." PDVSA owns greater than 50% of
Petrocedeño, and controls it directly or indirectly. Petrocedeño is thus defined to be the
equivalent of the Government of Venezuela, as well as all of its subdivisions and
agencies for purposes of the federal blocking regime.

last known address is not discoverable after diligent search, the plaintiff
must mail, by first class, the documents to the defendant at the defendant's
place of employment. The plaintiff shall file in the proceeding a certificate
of such service.

Fla. Stat. § 77.041.

Once the garnishee serves an answer to a writ of garnishment, Section 77.055

provides:

Within 5 days after service of the garnishee's answer on the plaintiff or
after the time period for the garnishee's answer has expired, the plaintiff
shall serve, by mail, the following documents: a copy of the garnishee's
answer, and a notice advising the recipient that he or she must move to
dissolve the writ of garnishment within 20 days after the date indicated on
the certificate of service in the notice if any allegation in the plaintiff's
motion for writ of garnishment is untrue. The plaintiff shall serve these
documents on the defendant at the defendant's last known address and any
other address disclosed by the garnishee's answer and on any other person
disclosed in the garnishee's answer to have any ownership interest in the
deposit, account, or property controlled by the garnishee. The plaintiff
shall file in the proceeding a certificate of such service.

Fla. Stat. § 77.055.

**Notice on Petrocedeño**

The Writ of Garnishment in this matter was issued on August 8, 2019.  DE

243.  Plaintiff served the Writ of Garnishment on Garnishee SSM Petcoke on

August 9, 2019.  DE 256, Return of Service.  Following Fla. Stat. 77.041(2) and

the dictates of the Court, Plaintiff, on August 13, 2019, within 5 days of the

issuance of the writ, mailed a copy of the writ of garnishment and the motion for

writ of garnishment to Petrocedeño at the defendants'[5] last known addresses (as

could be gleaned from a diligent search of publicly available sources) and filed a

---

[5] Although the statute uses the term "defendant", both this Court and the 11th Circuit
have established that the property owner, and not just the defendant, should receive the
statutory notices.

certificate of such service.  DE 247, Certificate of Service; *see also* Composite
Exhibit C containing image of envelopes and receipt for first class mail.[6]

On August 29, 2019, SSM Petcoke served its answer.  On August 30, 2019 (one
day later), Plaintiff sent the required notice (including a copy of the garnishee's answer,
and a notice advising the recipient that he or she must move to dissolve the writ of
garnishment within 20 days after the date indicated on the certificate of service in the
notice) to the last known addresses of Petrocedeño, including to three additional
addresses provided by SSM Petcoke.  Plaintiff filed a certificate of service for same.  DE
255 Notice of Writ of Garnishment in Compliance with Florida Statutes 77.055 and
Certificate of Service; *see also* Composite Exhibit D containing image of envelopes and
receipt for first class mail.

**Notice on FARC and ELN**

Both of these relevant Florida garnishment statutes require that notice be mailed
to the last known address of "defendants".  *See* Fla. Stat. §§ 77.041 and 77.055.
However, due to the impossibility of mailing designated Foreign Terrorist Organizations
with no known addresses, the Court has allowed for an alternative method, specifically

---

[6] Petrocedeño and Defendants were in fact each *twice* sent the notice required by Fla.
Stat. § 74.011(2) informing them that SSM Petcoke had been served with a writ of
garnishment concerning the blocked asset.  This occurred because, in an abundance of
caution, Plaintiff had also served the Garnishee with the Writ of Garnishment through the
Florida Secretary of State pursuant to Fla. Stat. § 48.181, in the event that the service of
the writ that had been made upon SSM Petcoke LLC's Florida-based officers and counsel
were ineffective.  The service upon the Florida Secretary of State triggered a second
round of follow-up notices pursuant to Section 77.041(2).  DE 248.  In the end, the
original service of the writ proved to be effective.  As such, this motion does not detail
the activities related to the back-up service made through Fla. Stat. § 48.181 or the
notices provided pursuant to it, other than to note that by employing the back-up method
of serving the Garnishee pursuant to Section 48.181, the defendants received the notices
required by Section 77.041(2) on two occasions.

notice by e-mail. DE 162. Pursuant to this Court's prior order, Plaintiff attempted notice to the Defendants of the Writ of Garnishment by e-mail on August 13, 2019 (within 5 days of service of the writ of garnishment on garnishee), and filed a certificate of service so certifying. DE 246, Certificate of Service.

On August 30, 2019, Plaintiff also sent the notice required by Section 77.055 (including a copy of the garnishee's answer, and a notice advising the recipient that he or she must move to dissolve the writ of garnishment within 20 days after the date indicated on the certificate of service in the notice) on each of the Defendants (FARC and ELN) via e-mail, and filed a certificate of service for each. DE 253 and DE 254, Notice of Writ of Garnishment in Compliance with Florida Statutes 77.055 and Certificate of Service (directed at FARC), and Notice of Writ of Garnishment in Compliance with Florida Statutes 77.055 and Certificate of Service (directed at ELN). More than 20 days have passed, and neither Petrocedeño nor Defendants have filed a motion to dissolve the writ of gasrnishment. They are therefore in default pursuant to Fla. Stat. § 77.07(2).

It is worth noting that Petrocedeño, as a subsidiary both majority-owned and controlled by PDVSA, has been designated a blocked entity for over seven months, and the account at issue has been blocked for nearly seven months, yet it has either not moved administratively to challenge its OFAC designation or remove the block, or has failed in its attempt to do so. Petrocedeño has apparently chosen to abandon the over $18,000,000.00 in blocked funds. It is likewise worth noting that neither FARC nor ELN have, to Plaintiff's knowledge, ever appeared in collection proceedings pursuant to the TRIA, despite numerous such proceedings, including in this action.

Because Plaintiff gave notice to all possible interested parties, including those envisioned in the Florida garnishment statute as well as other interested parties, and none of them has responded, the notice provisions of Florida garnishment law as well as notions of due process have been satisfied.

### B.  Compliance with the TRIA

As this Court has held in this case, "Section 201 of the TRIA authorizes holders of terrorism-related judgments to execute on the 'blocked assets' of terrorist parties."  *See* DE 178, Report and Recommendation, at 10-11; DE 183, Order Adopting Report and Recommendation, at 1 (adopting the findings of fact and conclusions of law in the Report and Recommendation).

The TRIA states:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note, TRIA § 201(a).

The execution may be made, provided that the following requirements are met:

> (1) a person has obtained a judgment against a terrorist party;
> (2) the judgment is either
>     (a) for a claim based on an act of terrorism, or
>     (b) for a claim for which a terrorist party is not immune under § 1605(a)(7);
> (3) the assets are "blocked assets" within the meaning of TRIA; and
> (4) execution is sought only to the extent of any compensatory damages.

*Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006); *see also* DE 178 at 11.

All four prerequisites are met here.

## I.      Judgment Against a Terrorist Party

As this Court has already held concerning the first prerequisite, both judgment

debtors, the FARC and ELN, are "terrorist parties".  *See* DE 178, Report and

Recommendation and DE 183, Order Adopting Report and Recommendation.  As

Magistrate Judge O'Sullivan found, and as this Court adopted:

> The FARC and ELN have been designated as Foreign Terrorist
> Organizations by the Secretary of State since October of 1997.  See United
> States Department of State:  Bureau of Counterterrorism, Foreign Terrorist
> Organizations (Sept. 12, 2012) *available at*
> *http://www.state.gov/j/ct/rls/other/des/123085.htm*; see also 8 U.S.C. §
> 1189 (authorizing the Secretary of State to designate an organization as a
> foreign terrorist organization).  President Bush named the FARC and ELN
> as Specially Designated Terrorists on October 31, 2001, pursuant to his
> authority under the International Economic Emergency Powers Act.  See
> Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001).  Moreover,
> the Eleventh Circuit has described the FARC as a terrorist party as it
> pertains to the TRIA.  See Stansell v. Revolutionary Armed Forces of
> Colombia, 704 F.3d 910, 912 (11th Cir. 2013 (per curiam) ("FARC has
> long been sanctioned by the United States for its international terrorism
> and narcotics trafficking activities."

DE 178, Report and Recommendation at 11-12.  Thus, as is the law of the case,

the first prerequisite to execution on the blocked funds pursuant to the TRIA has

been met.

## II.      Claim Based on an Act of Terrorism

Likewise for the second prerequisite, it is the law of the case that "[t]he claim on

which plaintiff's judgment is based falls squarely within the definition of "act of

terrorism" laid out by the TRIA".  *Id*. at 13-14.

### III.    Blocked Assets

"The TRIA defines 'blocked assets' as any asset seized or frozen by the United States under section 5(b) of the Trading with the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act."  DE 178 at 14.

The fact that the assets at issue here are blocked "can be definitively established by the fact that OFAC has taken action against the alleged agency or instrumentality under TWEA or the IEEPA …".  *Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 726 (11th Cir. 2014).

The assets blocked here were blocked according Executive Orders issued pursuant to sections 202 and 203 of the International Emergency Economic Powers Act (the "IEEPA").  First, on March 8, 2015, President Obama issued Executive Order 13692 blocking all property and interests in property of certain entities and individuals related to the Venezuelan government.  It begins with a preamble stating that its authorization is under the IEEPA: "By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act . . .".  *Id*.  On July 11, 2015, OFAC, acting pursuant to Section 8 of E.O. 13692[7], promulgated 31 C.F.R. part 591, including 31 C.F.R. § 591.406, titled, "Entities owned by persons whose property and interests in property are blocked."  It states:

> Persons whose property and interests in property are blocked pursuant to §
> 591.201 have an interest in all property and interests in property of an
> entity in which such blocked persons own, whether individually or in the
> aggregate, directly or indirectly, a 50 percent or greater interest. The

---

[7] Sec. 8 provides "The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by the IEEPA and section 5 of the Venezuela Defense of Human Rights Act … as may be necessary to carry out the purposes of this order …".

> property and interests in property of such an entity, therefore, are blocked, and such an entity is a person whose property and interests in property are blocked pursuant to § 591.201, regardless of whether the name of the entity is incorporated into OFAC's Specially Designated Nationals and Blocked Persons List (SDN List).

31 C.F.R. § 591.406.  Thus, the IEEPA authorized the original Venezuelan sanctions regime, as well as the regulation establishing that entities majority-owned by entities that are themselves blocked by the Venezuela sanctions regime are also blocked.

Several interim Executive Orders expanded on the original block concerning Venezuela.  *See* Executive Orders 13808, 13827, 13835, and 13850.  Each contains the same preamble invoking authority under the IEEPA.  *Id*.

On January 25, 2019, President Trump issued Executive Order 13857, containing the same preamble.  It further states in relevant part:

> Section 1. (a) Subsection (d) of section 6 of Executive Order 13692, subsection (d) of section 3 of Executive Order 13808, subsection (d) of section 3 of Executive Order 13827, subsection (d) of section 3 of Executive Order 13835, and subsection (d) of section 6 of Executive Order 13850, are hereby amended to read as follows:
> ''(d) the term ''Government of Venezuela'' includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PDVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.''

Executive Order 13857.

On January 28, 2019, OFAC, acting pursuant to Executive Order (E.O.) 13850, designated Petroleos de Venezuela, S.A. (PDVSA) as an entity whose assets and interests in assets were blocked.  *See* Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (January 28, 2019) *available at* *https://home.treasury.gov/news/press-releases/sm594*.  Given that Petrocedeño is both

majority-owned (*see* 31 C.F.R. § 591.406) and controlled (*see* E.O. 13857) by PDVSA, Petrocedeño's assets and interests in assets were also blocked.

On February 26, 2019, Garnishee SSM Petcoke, LLC, following the dictates of federal law, blocked assets in its possession belonging to Petrocedeño, the funds at issue here.  *See* Exhibit E, letter dated March 4, 2019 from Craig Cynor to OFAC and Appendix A thereto.  The blocked assets were clearly blocked pursuant to the President's authority under the IEEPA.  The third prerequisite to execution pursuant to the TRIA is therefore satisfied.  *See also* DE 178, Report and Recommendation, at 14-16 (finding that assets blocked pursuant to President's authority under the IEEPA are "blocked assets" within the meaning of the TRIA).

## IV.    Compensatory Damages

As was the case when Plaintiff previously sought to execute on blocked assets, Plaintiff seeks enforcement of his judgment only to the extent of the unrecovered portion of compensatory damages.  *See* DE 178 at 16.  As such, this requirement of the TRIA is satisfied.

## V.    Execution upon the Assets of an Agency or Instrumentality of a Terrorist Party

### A.   Agency or Instrumentality Definition

As this Court has held, due to the absence of a definition for "agency or instrumentality" in the TRIA, those terms must be given their ordinary meaning.  DE 178, Report and Recommendation at 18.  The Eleventh Circuit has since reached the same conclusion, finding "no reason to believe that any other standard is preferable or proper".  *Stansell,* 771 F.3d at 732 (specifically rejected the rigid definitions of agency or instrumentality found in the Foreign Sovereign Immunities Act).  Reviewing *de novo* a

case where the judgment debtor was the FARC, one of the judgment debtors here, the

Eleventh Circuit expanded on what the definition means in a case considering whether

designated narcotics traffickers were agencies or instrumentalities of the FARC.  It

approved as "a proper standard" a definition employed by the Middle District of Florida

that included any entity that assisted FARC's drug-trafficking, financial or money-

laundering operations.  *Id.* at note 6.[8]  In doing so, the Eleventh Circuit recognized that

---

[8] The Middle District of Florida standard that the 11th Circuit adopted further held that the definition included:

> 4. … any Specially Designated Narcotics Trafficker ("SDNT") with a nexus to or past dealings with the FARC qualifies as an agency or instrumentality of the FARC
> 5. Any SDNT person, entity, drug cartel or organization, including all of its individual members, divisions and networks, that is or was ever involved in … or that assisted the FARC's financial or money laundering network, is an agency or instrumentality of the FARC under the TRIA because it was either:
>
> > (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities [*10] of a specially designated narcotics trafficker [FARC]; and/or
> >
> > (2) owned, controlled, or directed by, or acting for or on behalf of, a specially designated narcotics trafficker [FARC]; and/or
> >
> > (3) playing a significant role in international narcotics trafficking [related to coca leaf, paste or cocaine manufactured or supplied by the FARC].
>
> This includes SDNT cartels, organizations, persons or entities which have ever supplied currency, weapons, ammunition, logistics, transportation, or supplies and/or financial or money laundering services to the FARC or its trafficking partners, directly or indirectly, as consideration for FARC coca paste or cocaine.

*Stansell v. Revolutionary Armed Forces of Colombia (FARC),* 2013 U.S. Dist. LEXIS 195164 at *9, 2013 WL 12133661, at *2 (M.D. Fla. May 2, 2013) adopted by *Stansell*, 771 F.3d at 731-732.

terrorist and money-laundering operations are "clandestine".  *Id*.  It recognized that drug

traffickers and money launderers "operate through layers of affiliated individuals and

front companies." *Id*. at 732.  Importantly, this standard reaches blocked parties even if

they were never previously linked to the terrorist party.  *Id*. at 739 ("[t]he Partnerships

had not previously been directly linked to FARC by OFAC or any other executive or

judicial authority.").  Further, according to the Eleventh Circuit, a district court can

support an agency or instrumentality finding through "indirect" connections that pierce

layers of companies and affiliated individuals to get at the silent powerful facilitators for

drug trafficking and money laundering.  *Id*. at 742 ("evidence Plaintiffs presented to the

district court was sufficient to establish the required relationship between FARC and the

Partnerships, *even if that relationship was indirect*") (emphasis added).

This standard has been widely adopted.  *See Stansell v. Revolutionary Armed

Forces of Colom.*, 2019 U.S. Dist. LEXIS 144631 *, 2019 WL 4040680 (D.D.C. August

26, 2019) (the Court adopts this standard for the reasons explained by the Eleventh

Circuit).  It was also applied in a case pending before the Honorable Robert N. Scola.  In

recommending the denial of seven motions challenging Judge Scola's rulings, Magistrate

Torres describes the standard thusly:

> This definition makes several things clear: past association with the FARC
> can result in a finding that a person is an agency or instrumentality under
> TRIA; indirect connections will suffice; and a person or group may be
> deemed an "agency or instrumentality" of the FARC even if that
> individual or group does not participate in the production, trafficking, or
> distribution of cocaine. *See Stansell*, 771 F.3d at 732, 742. Money
> laundering qualifies as an associated act. *Id.* at 732 ("Indeed, the agencies
> or instrumentalities here were, according to OFAC, part of FARC's money
> laundering operations.").

*Stansell v. Revolutionary Armed Forces of Colom.*, No. 19-20896-CV-SCOLA/TORRES, 2019 U.S. Dist. LEXIS 142981, at *22-23 (S.D. Fla. Aug. 21, 2019).

Of course, supplying support to drug-trafficking and money-laundering activities are not the only ways an entity could qualify as an agency or instrumentality of a judgment debtor.  As will be shown below, FARC and ELN are the beneficiaries of direct support from both Venezuela and PDVSA in other forms: Venezuela directly and vocally supports the FARC and ELN, allowing them and their members and leaders refuge in Venezuela, and providing direct support.  There is evidence that PDVSA itself has supplied uniforms, boats, and computers to the FARC, as well as laundering money for the FARC.  Any such entity that provides logistical support that aids a terrorist judgment debtors' military capabilities, in addition to assisting their drug-trafficking and money laundering efforts, would undeniably qualify as an agency or instrumentality under any ordinary definition of those terms.

### B.  Definition of Petrocedeño

According to Executive Order 13857, which was issued on January 25, 2019 and which resulted in the blocking of the assets at issue in the this matter, "the term 'Government of Venezuela' includes the state and Government of Venezuela, any political subdivision, agency or instrumentality thereof, including … Petroleos de Venezuela, S.A. (PDVSA), [and] any person owned or controlled, directly or indirectly, by the foregoing …".  As has been established, Petrocedeño is owned or controlled,

directly or indirectly, by PDVSA and thus the term "Government of Venezuela" includes Petrocedeño.[9]

      Given the applicable definitions contained in E.O. 13857 (that the government of Venezuela is defined to include PDVSA and its subsidiaries), and the standard for what constitutes an agency or instrumentality, it is not necessary to separately tie Petrocedeño to the judgment debtors FARC and ELN.  Petrocedeno is the Venezuelan state, and the Venezuelan state undeniably (and as will be shown) is an agency or instrumentality of the judgment debtors.  However, there is also specific evidence that PDVSA with its subsidiaries, including Petrocedeño, is the primary money-laundering vehicle for the narco-terrorist conspiracy between FARC, the government of Venezuela and other actors, and that, in addition to laundering funds, they support the FARC through other means. Thus, Plaintiff will provide evidence showing that there is both a relationship between the judgment debtors and Petrocedeño (based on the fact that Petrocedeño is part of the FARC's financial and money-laundering network), and a relationship between the judgment debtors and Venezuela more broadly.

---

[9] There is a second potential basis for defining Petrocedeño as Venezuela:  alter ego. PDVSA was recently been found to be the alter ego of Venezuela on the basis of a thorough analysis of the extent of the total breakdown of the rule of law in Venezuela, and in particular how the Venezuelan government dictates the acts of state-owned entities.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380 (D. Del. 2018), *aff'd.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez. (In re Petroleos de Venezuela, S.A.)*, 932 F.3d 126 (3d Cir. 2019).

### C.  Petrocedeño is as an Agency or Instrumentality of Defendants

The broad arch of the narco-terrorist conspiracy between Colombian guerrilla groups FARC and ELN and Venezuela is well-documented.[10]  It is a conspiracy that over time went from one in which Venezuela and its state-owned entities provided clandestine support to FARC and ELN, to one where Venezuela openly declares its support for FARC and ELN.  During the same time period, the relationship between the Venezuelan government and the state-owned oil company PDVSA and its affiliates, such as Petrocedeño, evolved from independence, to direct control and complete integration, with the Venezuelan military – the prime element in Venezuela allied with the FARC, ELN and narco-traffickers – placed at the helm of PDVSA.  The two developments – Venezuela's increasing alliance with FARC and ELN, and Venezuela's takeover of the oil sectors formerly private companies – culminated with the overt alliance between PDVSA and the narco-terrorist judgment debtors.  As Venezuela increasingly embraced its outlaw status as a badge of honor displayed for the audience of the revolutionary movements in the region, it brazenly placed military leaders allied with the Colombian guerrilla groups in leading posts at the company, placed one high-level narcotics trafficker linked to the FARC on its board, and made inside deals with another.

Plaintiff has engaged both David L. Gaddis and Brian Fonseca to attest to connections between the judgment debtors and Venezuela, PDVSA and Petrocedeño.  Their conclusions are consistent with a broad range of information and opinions that PDVSA is the primary money-laundering vehicle for FARC cocaine.

---

[10] Plaintiff has provided the court with an Appendix containing a plethora of source materials on the narco-terrorist conspiracy, as well as other documents relevant to this motion.  DE 257.

Indeed, well before Plaintiff learned of the blocked assets at issue in this matter,

Douglas Farah[11] testified before the United States Senate as follows:

> "The primary money laundering structure for the FARC (as well as the
> Maduro regime and other criminal groups) is the Venezuelan state oil
> company PDVSA, sanctioned by the U.S. government on multiple
> occasions."

Testimony of Douglas Farah, Senior Visiting Research Fellow, National Defense

University Center for Complex Operations Before the Senate Caucus on International

Narcotics Control "Adapting U.S. Counternarcotics Efforts in Colombia", September 12,

2017, SD-226 at p. 5.  *available at*

https://www.drugcaucus.senate.gov/sites/default/files/Douglas%20Farah%20Testimony_

Senate%20Caucus%20on%20International%20Narcotics%20Control%20.pdf.

---

[11] Mr. Farah's testimony has been broadly relied upon in TRIA proceedings concerning
the FARC.  For example, in the matter pending before Judge Scola, it was noted that:

> The evidence in support of Plaintiffs' argument includes testimony elicited
> from Douglas Farah, who testified that Lopez Bello operates as the
> "frontman," or *testaferro*, for El Aissami, laundering and moving money
> flowing to El Aissami as a result of his ties to the Cartel of the Suns — an
> organization, in turn, that earns significant income from the sale
> and exportation of FARC cocaine. Farah's testimony therefore establishes
> an indirect link between Movants and the FARC, connecting the two
> through Lopez Bello's financial activities undertaken on behalf of El
> Aissami.

*Stansell v. Revolutionary Armed Forces of Colom.*, No. 19-20896-CV-
SCOLA/TORRES, 2019 U.S. Dist. LEXIS 142981, at *23-24 (S.D. Fla. Aug. 21,
2019).  This testimony is illustrative, as El Aissami is former Vice President of
Venezuela and on the Board of Directors for PDVSA.

Farah further testified how PDVSA's subsidiaries are integral to Venezuela's efforts to aid the judgment debtor FARC.  For example, Farah described how PDVSA subsidiary ALBA Petroleos was used to launder money for FARC by the man who controls it, Jose Luis Merino, also "the FMLN's de facto leader", who is "a long-time FARC ally" and "a key weapons supplier to the Colombian rebels for more than two decades" and who "acquired hundreds of millions of dollars in unexplained wealth while helping the FARC guerrillas, corrupt elements of the Venezuelan government and other criminal groups move funds to safe harbor." *Id*. at 5.  Farah also explained how another PDVSA subsidiary, Albinisa, was employed to aid the FARC.  *Id.* at 5-6. These examples illustrate and leave little doubt that PDVSA subsidiaries such as Petrocedeño are employed to aid the FARC.

As David L. Gaddis[12] explains, it is the large and varied scope of PDVSA sales, including otherwise legitimate sales, that provide the business activities such as

---

[12] Mr. Gaddis began his career in local law enforcement before joining the federal DEA in February 1986, where he was assigned to the Atlanta Field Division in Atlanta, Georgia. Subsequent assignments included the DEA Miami Field Division; the DEA's Office of International Operations drug interdiction program, known as Operation SNOWCAP, with extended assignments in South and Central America; and San Jose, Costa Rica, where he worked as a Criminal Investigator in Costa Rica and Nicaragua. In 1995, Mr. Gaddis was promoted and assigned to the Hermosillo, Mexico, Resident Office where he served as the Resident Agent in Charge. In 1998, Mr. Gaddis was assigned to DEA Headquarters in Washington, D.C., serving as Staff Coordinator and Section Chief in the Mexico and Central America Section, Office of International Operations. In 2000 he assumed the position of Deputy Chief of International Operations. In 2001, Mr. Gaddis was reassigned as Assistant Special Agent in Charge for the North Carolina District, where he managed DEA operations throughout the State until assignment to the Senior Executive Service as Regional Director for DEA's Andean Region in Colombia, Venezuela, Ecuador and Peru. Mr. Gaddis headed the management and enforcement operations of this region until 2006 when he was promoted from Bogotá, Colombia, to Mexico City, Mexico, as DEA's Regional Director for Canada, Mexico and Central America.  In 2009, Mr. Gaddis was selected as Deputy Chief of Operations, Office of Global Operations, Chief of Enforcement Division, and reassigned to DEA Headquarters

shipments that mask FARC and ELN narcotics trafficking, for funds transfer

opportunities employed in FARC and ELN money-laundering, and the funds that can be

employed for intermingling with FARC and ELN "dirty" money.  He states:

> 27.     PDVSA and its subsidiaries provide ample opportunities for
> shipments, money transfers, and loans to third parties, as well as
> movements of monies within Venezuela and PDVSA.  By mixing money
> generated by illicit activities – including the trade in FARC and ELN
> cocaine, but also funds generated by their other crimes such as the
> kidnapping and ransom of individuals such as the plaintiff – with money
> generated by the sale of petroleum and related products, PDVSA and its
> analogs (including Petrocedeño SA) launder funds.  Even sellers of
> legitimate goods within PDVSA thereby are instrumental to and contribute
> to the PDVSA money-laundering enterprise.

Gaddis Aff., par. 27.

Further, monies flowing into Petrocedeño flow to PDVSA (as has been shown,

*supra*, at note 1).  And, monies flowing into PDVSA go directly to the government of

Venezuela.  Venezuela has dropped the pretext that PDVSA is an independent enterprise.

As the then Acting Deputy Assistant Secretary of State Kevin Whitaker testified before

Congress in 2011:

> MR. WHITAKER: PDVSA's receipts go direct – this is a change from the
> past. In the past, PDVSA operated as a – it was government owned but it
> operated as an independent entity with its own financial structure. One of
> the changes that Chavez made was to insist on PDVSA's receipts going
> directly to the government.

*See* Testimony of Acting Deputy Assistant Secretary of State Kevin Whitaker Before

Joint Hearing of Committee on Oversight and Government Reform and Committee on

Foreign Affairs "Venezuela's Sanctionable Activity", June 24, 2011, p. 52  *available at*

---

in Arlington, Virginia. In this capacity, Mr. Gaddis coordinated enforcement and
administrative matters for all of DEA's field elements – domestic and foreign – and
represented DEA's offices worldwide on matters relating to joint investigations and
enforcement initiatives and other programs within the inter-agency community. Exhibit
F, Affidavit of David L. Gaddis at pars. 2-3.

*https://www.govinfo.gov/content/pkg/CHRG-112hhrg71297/pdf/CHRG-*

*112hhrg71297.pdf*

As Gaddis testifies,

18.     There has been long-standing cooperation between the FARC and
ELN and the Venezuelan government, the Venezuelan military,
Venezuelan state-owned companies generally, and PDVSA specifically, in
a joint criminal enterprise to send cocaine to the United States and launder
the proceeds.  This is accomplished in part through PDVSA's ownership
and managing influences over subsidiaries in Venezuela and countries
abroad.  One example is Petrocedeno S.A.

Gaddis Aff., par. 18.

Venezuela in fact now wears its outlaw status as a badge.  It no longer protects the

image of PDVSA, but rather brazenly exhibits its connections to the Colombian guerrilla

groups and the drug trade.  Concerning two accused drug traffickers, Gaddis testifies:

22.     Both Saab and El Aissami have close ties to PDVSA.  For example, an
upstart company headed by Saab reportedly was handed a $4.5 billion contract
from PDVSA despite no experience in the field.  El Aissami was named to the
PDVSA Board of Directors in September 2018. Through its willingness to link
PDVSA to these known drug traffickers, Venezuela has brazenly left little doubt
that PDVSA is part of a vast criminal drug dealing and money-laundering
enterprise.

Gaddis Aff. par. 22 (footnotes omitted).  El Aissami holds the distinction of making both

the Board of Directors of PDVSA, and the U.S. Government's Most Wanted List for

narcotics trafficking and money laundering.  *See* "Former vice president of Venezuela

Tareck El Aissami and Venezuelan businessman Samark Lopez Bello added to ICE's

Most Wanted List for international narcotics trafficking, money laundering" *available at*

*https://www.ice.gov/news/releases/former-vice-president-venezuela-tareck-el-aissami-*

*and-venezuelan-businessman-samark.*

Likewise, Brian Fonseca[13] describes an alliance between the FARC and ELN on the one hand, and the Venezuelan government and military on the other, in which the latter control PDVSA and its subsidiaries in order to engage in a complex network of trafficking and money-laundering schemes to aid the FARC and ELN.  He states:

> 1.      It is my opinion, within a high degree of professional certainty, that the government of the Bolivarian Republic of Venezuela, including its National Bolivarian Armed Force (Fuerza Armada Nacional Bolivariana, FANB) and Venezuelan Intelligence Service (Servicio Bolivariano de Inteligencia, SEBIN), has longstanding institutional relationships with Colombian insurgencies, namely the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia, FARC) and the National Liberation Army (Ejército de Liberación Nacional, ELN), dating back to as early as the year 2000.
>
> 2.      Additionally, the Venezuelan government has placed the FANB at the helm of Petróleos de Venezuela, S.A. (PDVSA) to assert greater control and influence over PDVSA, including PDVSA's operations, relationships with state and non-state actors, and other affiliated enterprises.  *Combined, the FANB, PDVSA and its subsidiaries engage in complex network of illicit trafficking and money laundering schemes that intersect with and aid Colombian insurgencies such as FARC and ELN*, based on my ongoing research.

Fonseca Aff. at pars. 1-2 (emphasis added).

Fonseca describes the history of the alliance, which he has been researching for over a decade.  He states:

---

[13] Brian Patrick Fonseca is the Director of the Institute for Public Policy at Florida International University's Steven J. Green School of International and Public Affairs. He also serves as an adjunct professor in the Latin American and Caribbean Studies Center and the Department of Politics and International Relations.  He has spent more than a decade studying politics and security in Latin America with a focus on Colombia and Venezuela.  He has conducted field research in Venezuela during surges in political violence – in 2007 and 2014.  Since 2011, he has served as subject matter expert supporting United States Southern Command (USSOUTHCOM).  In 2016, he served as lead author on a groundbreaking study titled "Venezuela Military Culture.  In 2019, he has consulted with the Department of Defense, Department of State, and the U.S. intelligence community on security in Venezuela.  Exhibit G, Affidavit of Brian Fonseca at pars. 3-9.

11.     Following Hugo Chávez Frías' rise to the Venezuelan presidency in 1999, the government began intentionally promoting a passive environment for illicit trafficking organizations and international terrorist organizations—such as the FARC and ELN. Relations between Chávez and the FARC started as early as 2000. In fact, files retrieved from the computer of FARC commander Raúl Reyes, alluded to a meeting between President Chávez and him in 2000. The files indicated that Chávez agreed to provide resources to support FARC operations.

12.     Based on my research however, it was not until the Colombian government withdrew refuge provisions for the FARC in 2002, that Chávez began allowing FARC guerrillas to establish training camps in the states of Zulia, Táchira, and Apure that border Colombia. During Chávez's tenure, Venezuelan military leaders were ordered to provide logistical support to FARC guerrillas launching raids into Colombia. Chávez's support to the FARC alienated many of his senior military leaders.

13.     As indicated in 2008 U.S. Department of Treasury reporting, Venezuelan senior officials were sanctioned as a result of their ongoing support to FARC and drug trafficking organizations such as the Cartel of the Suns (Cartel de los Soles). In fact, Chávez expelled the U.S. Drug Enforcement Agency (DEA) from Venezuela in 2005—after also expelling U.S. military officials in 2004. Based on my research, Chávez's expelling of U.S. representatives during the early 2000s corresponded with an increase in visible support to the FARC as well as Cuban security and intelligence organizations.

14.     In 2007, I conducted field research in Venezuela on growing Iranian activities in Venezuela. It led to a publication titled "Emerging Relations: Iran-Latin America" that was published in 2009. During that trip to Venezuela, I conducted interviews with various academics, public officials (on and off the record) as well as active and retired military leaders. Several cited concerns over the growing ties between the Chávez government and Colombian insurgencies and transnational criminal organizations, as well as Iranian sponsored terrorist organizations—the focus of my study at the time. Several cited Venezuelan logistical and economic support. Economic support was argued at the time to be coming directly and indirectly from PDVSA activities.

15.     Based on my research, Venezuela's then-Director of Military Intelligence Directorate (DGIM), Hugo Armando Carvajal Barrios, alias "El Pollo," assisted the FARC in Arauca, an area located on the Venezuela/Colombia border. Carvajal protected FARC drug shipments, provided the group weapons, and enabled FARC members' mobility across the border by falsifying Venezuelan government identification

documents.  In 2019, Carvajal was arrested in Spain. After his arrest, he
confirmed to authorities the institutional ties between the Venezuelan
government and Colombia insurgencies, namely the FARC. Carvajal
stated that, acting on behalf of the Venezuelan president, he met with the
FARC to support drug shipments into the United States.

Fonseca Aff. pars. 11-15 (footnotes omitted).

A Sept. 15, 2019 *Wall Street Journal* report, based on documents submitted by

federal prosecutors from the Southern District of New York seeking Carvajal's

extradition from Spain, relates the full-throated cooperation between the FARC and the

Venezuelan government.[14]  According to the *Wall Street Journal* article:

Venezuelan President Hugo Chávez in the mid-2000s ordered his top lieutenants
to work with Colombian Marxist guerrillas to flood the U.S. with cocaine in his
government's efforts to combat the Bush administration, according to U.S.
documents obtained by The Wall Street Journal that shed new light on the leftist
regime's struggle with Washington.

The documents, prepared by federal prosecutors from the Southern District of
New York, outline for the first time the possible role of Mr. Chávez, an icon of
the Latin American left who died from cancer in 2013, in drug trafficking. They
assert that several leaders who served Mr. Chávez and remain in key posts in
Venezuela's regime today wielded cocaine trafficking as a weapon against their
ideological adversary, the U.S.

In 2005, Mr. Chávez convened a small group of his top officials to discuss plans
to ship cocaine to the U.S. with help from the Revolutionary Armed Forces of
Colombia, or FARC, said a participant in the meeting who, at the time, was a
justice on Venezuela's supreme court, according to the papers. The Bush
administration was strongly criticizing his governing style then and had publicly
approved of a 2002 coup that failed to oust him.

"During the meeting, Chávez urged the group, in substance and in part, to
promote his policy objectives, including to combat the United States by 'flooding'
the country with cocaine," said an affidavit in the documents written by a U.S.
Drug Enforcement Administration agent. The former supreme court justice was
identified as Eladio Aponte, who fled to the U.S. in 2012 and has been a witness
on drug cases, said a person familiar with his role in the investigations.

---

[14] *See Wall Street Journal* "Venezuela's Hugo Chavez Worked to Flood U.S. With
Cocaine, U.S. Prosecutors Say", *available at https://www.wsj.com/articles/venezuelas-
hugo-chavez-worked-to-flood-u-s-with-cocaine-u-s-prosecutors-say-11568557780*

***

As part of an alliance with the FARC, the affidavit says Venezuela's government discussed dividing drug profits while providing the rebels with weapons to fight the Colombian government. The American officials characterized the Venezuelan military officers as a gang called the "Cartel of the Suns"—a reference to the insignia used by Venezuelan generals.

"The objectives of the Cartel of the Suns included not only enriching its members but also using cocaine as a weapon against the United States due to the adverse effects of the drug on individual users and the potential for broader societal harm," said a superseding indictment against Mr. Carvajal, one of the documents sent to the Spanish court.

***

The affidavit says that coordination between the guerrillas and the Venezuelan government to traffic cocaine was discussed in meetings with Mr. Carvajal that included Diosdado Cabello, a close Chávez ally now considered to be the Maduro regime's second most powerful man, and Tareck El Aissami, also a current top official. At one meeting, Mr. Cabello described sea and land drug trafficking routes through Venezuela, the documents showed. At another, Mr. Carvajal said coordination with the "comrades," meaning the FARC, was going well.

Gaddis testifies to the alliance between Venezuela and the FARC and ELN as

follows:

21.     Indeed, it is well-documented, that the regimes of Mr. Chavez and his successor, Nicolas Maduro, have long used Venezuelan state-owned entities to further their narco-trafficking activities in alliance with Colombian guerrilla organizations FARC and ELN.  For example, as has recently been reported, Venezuela and drug cartels used shipments from Mexico to Venezuela – ostensibly of food for a Venezuela state-owned food subsistence program – to hide shipments of cash generated by the cocaine trade.  *See* ABC International, "Líderes chavistas recibieron dinero del narco mexicano vía Costa Rica" *available at https://www.abc.es/internacional/abci-lideres-chavistas-recibieron-dinero-narco-mexicano-costa-rica-201909152304_noticia.html*.  This method of using legitimate commodities to hide illicit shipments is consistent with my experience.  A number of the individuals and companies implicated in the scheme have been designated by OFAC.  *See* July 25, 2019 OFAC Press Release, U.S. Department of Treasury, "Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP" *available at*

*https://home.treasury.gov/news/press-releases/sm741*. Those designated by OFAC include Colombians Alex Saab and Alvaro Puido.  According to the Department of the Treasury, these Colombians, (who have known ties to the FARC), had access through Nicolas Maduro's sons to Maduro and Tareck Zaidan El Aissami Maddah (El Aissami), the current Minister of Industry and National Production and former Executive Vice President of Venezuela.  Id.  El Aissami himself has been designated a Specially Designated Narcotics Trafficker by OFAC.  *See* Feb. 13, 2017 OFAC Press Release, "Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello" *available at https://www.treasury.gov/press-center/press-releases/Pages/as0005.aspx*

***

23.     According to the *Wall Street Journal* report, this cooperation was so overt that in 2008 PDVSA pledged to purchase uniforms, computers and boats for the FARC.  It states:

> At a 2008 meeting at a ranch in which Mr. Chávez was meeting with FARC guerrilla commander Luciano Marin, the president called Mr. Carvajal by phone and told him to provide weapons to the guerrillas, according to Mr. Salazar, the former bodyguard. At the meeting, Mr. Chávez also told Mr. Marin that funds provided by Petróleos de Venezuela, the country's state oil company, would pay for uniforms, computers and boats needed by the guerrillas. Mr. Salazar said he also overheard Mr. Chávez on the call with Mr. Carvajal say that some of the weapons to be provided to the guerrillas had been used previously by the Venezuelan army while others had been acquired from Russia. Requests for comment at the oil company weren't returned.

*See Wall Street Journal* "Venezuela's Hugo Chavez Worked to Flood U.S. With Cocaine, U.S. Prosecutors Say", *available at https://www.wsj.com/articles/venezuelas-hugo-chavez-worked-to-flood-u-s-with-cocaine-u-s-prosecutors-say-11568557780*

24.     Even more recently and more overtly, the Maduro regime has publicly declared its support for the FARC:

> Last month, Mr. Marin, a top negotiator of the peace agreement signed between the guerrillas and the Colombian government in 2016, publicly announced he was again taking up arms against the Colombian government. Shortly before Mr. Marin's announcement, President Maduro had publicly declared that he and

another guerrilla commander were "leaders of peace" who would
be welcomed in Venezuela.

*Id*.  Venezuela has provided sanctuary to many FARC leaders.  An
example is Seuxis Paucias Hernandez - known best by his guerrilla nom
de guerre Jesus Santrich, who was indicted in 2017 by a U.S. grand jury
for trafficking ten tons of cocaine to the United States.  Colombia
President Ivan Duque has alleged that Paucias Hernandez is currently
hiding in Venezuela and accuses President Maduro of harboring FARC
and ELN fugitives.

25.     This support for the FARC is in line with Venezuela's general
support for and mutual cooperation with leftist movements and
governments in the region, with Venezuela's primary contribution being
the largess from PDVSA.  The mutual cooperation is extensive.  Cuban
intelligence agents are advising and working jointly with the Venezuela
Government, including security for PDVSA.  The Cuban political machine
also supports the leftist political ideology and rise of the FARC and ELN.
The Cuban government has trained Venezuelan soldiers in Venezuela,
trained Venezuelan intelligence agents in Havana, Cuba and reviewed and
restructured parts of the Venezuelan military.  Through mutual
cooperation, alliances were furthered between the Venezuelan military,
PDVSA and the FARC and ELN, which the Cuban government fully
supports. According to a recent report, many Bolivarian member states'
leaders have "shared histories fighting in support of far left armed guerilla
forces . . . .  [Further], Chavez's stature in the Bolivarian group was
derived in part from his military experience and guerrilla ideology, but
mostly from his willingness to spend billions of PDVSA dollars across the
hemisphere."   While the Bolivarian Revolution institutionally began in
1998, the roots of this movement began decades earlier, with Nicaragua's
Sandinista National Liberation Front (FSLN), El Salvador's Farabundo
Marti National Liberation Front (FMLN), the Cuban Revolution, and the
Revolutionary Armed Forces of Colombia (FARC).

26.     The public positions of the Venezuelan government concerning
both the FARC (welcoming and supporting it with PDVSA-generated
dollars) and PDVSA (publicly associating it with drug traffickers allied
with the FARC), leave no doubt that FARC and PDVSA are close allies.
In fact, PDVSA and its subsidiaries, due to their size and scope, are one of
the primary means through which FARC proceeds are laundered, in terms
of aggregate dollar value.  "The primary money laundering structure for
the FARC (as well as the Maduro regime and other criminal groups) is the
Venezuelan state oil company PDVSA, sanctioned by the U.S.
government on multiple occasions."

27.     PDVSA and its subsidiaries provide ample opportunities for shipments, money transfers, and loans to third parties, as well as movements of monies within Venezuela and PDVSA.  By mixing money generated by illicit activities – including the trade in FARC and ELN cocaine, but also funds generated by their other crimes such as the kidnapping and ransom of individuals such as the plaintiff – with money generated by the sale of petroleum and related products, PDVSA and its analogs (including Petrocedeño SA) launder funds.  Even sellers of legitimate goods within PDVSA thereby are instrumental to and contribute to the PDVSA money-laundering enterprise.

28.     As evidence of the size and scope of PDVSA's money-laundering, one can refer to recent indictments of PDVSA executives and co-conspirators.  On July 26, 2018, 12 individuals tied to Venezuela's state oil company PDVSA were charged in the Southern District of Florida with conspiracy to launder $1.2 billion from the oil company through U.S. banks, brokerage firms, and real estate investment companies.   The criminal complaint detailed at least one tool in the joint criminal enterprise's toolbox to move significant sums of money to safe harbor over the last decade. While the complaint (and its subsequent convictions) are important, this case represents only one facet of the manner in which funds have been illicitly moved by state structures since the Bolivarian Revolution was launched with Hugo Chávez's election.  This joint criminal enterprise has not only taken billions of dollars from Venezuelan state coffers, but also used PDVSA as the central structure for money laundering and corruption throughout the region.  The sum of these criminal actions is not fully known, but a recent investigation by a Latin American journalist consortium found that at least $10 billion U.S. dollars in Venezuela moved through this criminal network between 2007- 2018.

29.     As shown herein, principal players in this criminal conspiracy are the FARC and ELN and their drug cartel allies, which produce the illicit funds, and Venezuela and its state-owned entities, including and especially PDVSA and its subsidiaries such as Petrocedeño SA, which both launder the funds and provide logistics, weapons, and other material for the FARC and ELN.  I therefore conclude that PDVSA subsidiary Petrocedeño SA is undeniably an agency and instrumentality of the FARC and ELN.  As cited by Latin America Socio-political expert Douglas Farah, another PDVSA subsidiary, Albinisa, was also employed to aid the FARC.  *Id.* These examples illustrate and leave little doubt that PDVSA subsidiaries such as Petrocedeño are employed to aid the FARC.

Gaddis Aff. pars. 21-29 (footnotes omitted).

The Fonseca affidavit likewise gives a multitude of examples of collaboration

between Venezuela and the Colombian guerrilla movements FARC and ELN (*see*

Fonseca Aff., pars. 16-23), before concluding:

> 24.    In my opinion, with a high degree of professional certainty, Maduro is likely relying on the ELN, among other armed groups, to help him remain in power after the 2019 surge in domestic and international pressure to topple his government. According to a July 2019 InSight Crime report citing former head of SEBIN General Manuel Ricardo Christopher Figuera, "ELN has been expanding rapidly in Venezuela and is involved in a plethora of criminal activities, including drug trafficking, illegal mining, extortion and smuggling. The ELN forms part of a broader panorama of irregular armed groups propping up Maduro's government." Figuera asserts that Maduro is head of the Cartel of Suns criminal network.

Fonseca Aff., par. 24 (footnote omitted).

Fonseca then turns to the specific nexus PDVSA and its subsidiaries have to the

FARC, ELN and transnational drug trafficking organizations.  He states:

> **PDVSA and its Subsidiaries Ties to Colombian Insurgencies and Transnational Drug Trafficking Organizations**
>
> 25.    In the early 2000s, then President Hugo Chávez launched a campaign to purge PDVSA of political opposition. In fact, Chávez dismissed nearly 20,000 PDVSA employees after workers went on strike in late 2002 and implemented radical structural changes that weakened checks and balances and eroded transparency and accountability. At the same time, he usurped the country's judiciary, making it easier for PDVSA officials to enrich themselves by engaging in widespread corruption and illicit trafficking activities.
>
> 26.    Not long after the purging, Chávez started leveraging PDVSA as a means of laundering illicit trafficking revenue and directing funding to political allies around the region—including Colombian insurgencies.
>
> 27.    As my research indicates, it is well-known that Rafael Ramírez, former Venezuelan minister of Energy and PDVSA president between 2003 to 2013, siphoned billions of dollars from PDVSA—for personal enrichment and in support of Chávez' social, political and security activities. Ramírez also deepened PDVSA's engagement with illicit trafficking organizations such as the Cartel of the Suns, among others.

Ramírez, at the direction of Chávez used PDVSA to get around U.S. sanctions. In 2010, the U.S. government sanctioned PDVSA for its engagement in supplying the Iranian energy sector through operations performed through PDVSA's subsidiaries.  Ramírez was fired in 2017 by Maduro after the two had a falling out, and he has been in exile since. In 2017, the Canadian government sanctioned Ramírez on the ground of widespread corruption. Ramírez has gone on the record to confirm that Venezuela is host to both foreign armed groups, including FARC and ELN, and drug trafficking organizations.

28.     In 2013, Carlos Malpica Flores, the nephew of Maduro's wife Cecilia Flores was appointed national treasurer and PDVSA vice-president in 2013. From 2013 to 2015, Malpica continued and likely increased PDVSA's money laundering activities and associated drug trafficking ties.

29.     Earlier this year, former PDVSA executive Horacio Medina went on the record and described former President Chávez and President Nicolás Maduro's support of complex illicit networks driven by fictitious sales and embellished crude production operations to justify profits that were coming from drug trafficking activities.

30.     In 2016, President Maduro established formal links between PDVSA and the FANB. Maduro established a public company that grants FANB authorization to explore and exploit oil deposits in Venezuela. Maduro officially established the Military Company of Mining, Oil and Gas Industries (Compañía Anónima Militar de Industrias Mineras, Petrolíferas y de Gas, Camimpeg), and charged it with the responsibility of everything relative to the activities of petroleum services, gas and exploitation of minerals in general, without independent oversight. Camimpeg was designated to maintain a commercial relationship with PDVSA and provide support and protection but instead provided the Venezuelan military with greater influence over all aspects of PDVSA operations.

31.     In 2017, Maduro further embedded the military into PDVSA by appointing Major General Manuel Quevedo as president of PDVSA, replacing former president Nelson Martínez as well as oil minister Eulogio del Pino.  According to my research, FANB's increased presence in PDVSA leadership positions increased the military institution's control over oil infrastructure and resources as well as influence over PDVSA subsidiaries.

32.     Quevedo purged PDVSA by replacing employees and engineers with soldiers. Arresting more than fifty employees from PDVSA and its U.S.-based subsidiary, Citgo; including in the arrests, naturalized U.S. citizens. The purge resulted in a significant loss of technical talent and an

increase in the militarization of PDVSA's operations.  Based on my research, including first hand interviews with associates close to Maduro, Maduro is acutely aware of the illicit activities that the FANB and PDVSA officials are engaged in using PDVSA. These include aiding the FARC through, among other things, money laundering.

33.     In 2017, Spanish authorities detained and charged several Venezuelan officials with conspiring to commit bribery through PDVSA activities, including Nervis Villalobos, former deputy energy minister, Rafael Reiter, former aide to Venezuela's ambassador to the United Nations, Cesar David Rincón, an executive at the procurement unit of PDVSA, and Luis Carlos de León, the former official at the Venezuelan state-run electric company. On October 27, 2017, The Spanish judge charged twenty-eight individuals with laundering $2 billion from PDVSA. The court ruled that the defendants acquired unlawful payments from several companies from China, which were in turn remunerated with contracts to the Venezuelan oil industry.

34.     PDVSA and its subsidiaries are a central structure through which government officials launder money and induce corruption throughout Latin America and the Caribbean. The scale is grand. A 2019 report published by IBI argue that Venezuelan officials drained an estimated $28 billion from PDVSA. The authors assert that at least $10 billion moved from PDVSA and its subsidiaries through transnational criminal organizations between 2007 and 2018.

***

36.     It is my professional opinion that the Venezuelan government, including its FANB and PDVSA, among others, have deep institutional ties with Colombian insurgencies and transnational drug trafficking organizations. Additionally, government officials representing FANB and PDVSA routinely engage in illicit trafficking, including, but not limited to, drug trafficking, money laundering, and widespread corruption.

37.     Additionally, based on my research, Venezuelan military and civilian officials use PDVSA and its subsidiaries as the primary means of facilitating illicit trafficking activities. PDVSA officials use fictitious oil and gas sales, disingenuous loans, and infrastructure projects that never materialize as means of moving proceeds from drug trafficking, among other illicit activities.

Fonseca aff., pars 25-24, 36-37 (footnotes omitted).

Overwhelming evidence supports the inevitable conclusion that Venezuela, PDVSA and Petrocedeño are each an agency or instrumentality of the FARC and/or ELN.

## CONCLUSION

This case has come full circle.  Plaintiff, who resided at the border of Venezuela and Colombia, suffered the most grievous harm imaginable at the hands of the FARC and ELN.  He was broken by them, and his family impoverished.  For the next twenty years, they plied their illicit trade across this same border, and broke a nation and its people in the process, while he pursued justice.  Now, Plaintiff seeks to conclude his journey by collecting from the co-conspirators whose aid, in the form of money-laundering, has long fed the criminal conspiracy that nearly destroyed him.  The TRIA allows for him to enforce his judgment against the agencies and instrumentalities of the FARC and ELN. Justice compels this enforcement.

**WHEREFORE** Plaintiff requests, and Garnishee does not oppose, entry of an order:

(i)      finding that Petrocedeño SA is an agency or instrumentality of the FARC and/or ELN;

(ii)     finding that its blocked assets are subject to execution under the TRIA as a blocked asset of an agency or instrumentality of a terrorist party;

(iii)    finding that Plaintiff has served a writ of garnishment and satisfied all notice requirements pursuant to Florida procedure;

(iv)    finding that Defendants and Petrocedeño have failed to timely move to dissolve the writ of garnishment and are in default;

(v)     directing SSM Petcoke LLC to surrender to Plaintiff's counsel funds equivalent to the outstanding balance of the compensatory portion of Plaintiff's judgment plus interest and less Garnishee's reasonable fees and costs within ten (10) business days from the date of the order;

(vi)    directing the clerk to release to SSM Petcoke LLC the garnishment fee of $100;

(vii)   finding that upon completion of the requirements in the Court's order, Garnishee will be released from any liability to Petrocedeño SA (or anyone else with claimed ownership rights to the blocked funds), and discharged from this garnishment action for compliance with the Order of the Court.

A proposed order is attached hereto as Exhibit H.

Dated:  October 1, 2019.

Respectfully submitted,

BUCKNER + MILES
3350 Mary St.,
Miami, Florida 33133
Telephone: (305) 964-8003

By:  s/ Seth E. Miles
      Seth E. Miles, Esq.,
      Florida Bar No. 385530
      seth@bucknermiles.com

do Campo & Thornton, P.A.
Chase Bank Building
150 S.E. 2nd Street, Ste. 602
Miami, Florida 33131
Telephone:  (305) 358-6600
Facsimile:  (305) 358-6601

By:  s/ John Thornton
      John Thornton
      Florida Bar No. 004820
      jt@dandtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I hereby certify** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

**I further certify** that in compliance with this Court's Order [DE 162], a copy of the foregoing was sent to:

> EJERCITO DE LIBERACION NACIONAL,
> a/k/a ELN, a/k/a National Liberation Army; and
>
> FUERZAS ARMADAS
> REVOLUCIONARIOS DE COLOMBIA,
> a/k/a FARC, a/k/a REVOLUTIONARY
> ARMED FORCES OF COLOMBIA

by e-mail to FARC at contacto@farc-ep.co, and to ELN at vocesdecolombia@eln-voces.net and tu_voz@eln-voces.net this  1st day of October 2019.

**I further certify** on October 1, 2019, that a copy of the foregoing was sent via first class mail to:

> Petrocedeño S.A.
> Francisco Solano Lopez Ave.
> Calle Negrin, Business Center Building
> Distrito Metropolitano, 1073
> Caracas, Venezuela
>
> PDVSA Petrocedeño S.A.
> Edificio Petroleos De Venezuela, Torre Este, Piso 9
> Avenida Libertador con calle El Empalme, La Campina
> Caracas, Venezuela 1010
>
> PDVSA Petrocedeño S.A.
> Torre Este Piso 9
> Edif Petroleos de Venezuela, Avenida Libertador
> Urb La Campina
> Caracas, Distrito Federal, Venezuela
>
> Petrocedeño S.A.
> Av. Francisco Solano
> Centro Empresarial Sabana Grande, Piso PH
> Sabana Grande, Caracas 1050
> Venezuela
>
> Petrocedeño S.A.

Calle Cali
EDIF PAWA Piso 6, OF General
URB. Las Mercedes, Caracas 1060
Venezuela

Petrocedeño S.A.
URB. La Campina
Avda Libertdaor
Calle El Empalme Edif. Petroleos De Venezuela
Caracas, Torre Este 1060
Venzuela

s/ *John Thornton*
John Thornton